**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Turiano, | No. CV-21-01428-PHX-MTL |
| Plaintiff, | **PRELIMINARY INJUNCTION** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Christopher Turiano's Motion for Preliminary Injunction (Doc. 10). The Motion is fully briefed (Docs. 10, 16, 23, 26), and the Court held an evidentiary hearing on December 7, 2021 (Docs. 44, 52). After the hearing, the parties filed closing briefs. (Docs. 53, 54.) For the reasons that follow, the Court will grant the motion and issue an injunction.

## I.    INTRODUCTION

### A.    Factual Background

The Court makes the following factual findings based on Plaintiff's Complaint, the parties' written submissions on Plaintiff's Motion for Preliminary Injunction, and the evidentiary hearing held on December 7, 2021.

This action involves an attempt by the Phoenix Police Department (the "Department") to access data located on Officer Christopher Turiano's personal cell phone pursuant to an internal investigation. Turiano is a 25-year veteran of the Phoenix Police Department who is currently assigned to the Department's Downtown Operations Unit

("DOU"). (Doc. 10 at 2; Doc. 52 at 105.) Until recently, Turiano also served in the Department's Tactical Response Unit ("TRU"), a specialty detail responsible for crowd control and intervention at large events and protests. (Doc. 10 at 2; Doc. 52 at 91, 105–06.) Turiano served in the TRU as a grenadier—an officer trained in the discharge of munitions. (Doc. 52 at 91–92, 106.)

On August 22, 2017, the TRU, including Turiano, was assigned to oversee ground operations at a large protest in downtown Phoenix. (*Id.* at 106.) Throughout the course of the evening, the protest devolved into violence, with various reports of protestors defying law enforcement instructions, damaging property, and throwing items in the direction of law enforcement. (Doc. 16 at 2.) After one protestor (later identified as Joshua Cobin) kicked a tear gas canister toward police, Turiano fired a 40mm OC direct impact round— a type of non-lethal munition—at him. (Doc. 52 at 106.) The round struck Cobin in the groin area. (*Id.* at 120.) The incident was captured on video and published by various local and national news media outlets. (*Id.* at 106–07.)

A year later, in September 2018, a group of protesters and two nonprofit groups filed a class action lawsuit against the City, Chief of Police Jeri Williams, and several members of the TRU, including Turiano, for excessive use of force in connection with the protest (the "Protest Lawsuit"). (Doc. 16 at 2–3; Doc. 52 at 108–09.) The Department and officers are being defended in the Protest Lawsuit by law firms Osborn Maledon and Manning & Kass, Ellrod, Ramirez, Trester, LLP. (Doc. 10 at 3.) During discovery in that case, attorneys from Osborn Maledon requested that the officer defendants, including Turiano, allow their personal cell phones to be imaged and searched for specific terms relating to the litigation.[1] (Doc. 10 at 3; Doc. 52 at 92, 109.) Upon voicing privacy concerns, the officers were assured that the data would remain confidential, would be downloaded and stored by a third-party vendor, would be used only for purposes of the Protest Lawsuit, and would be subject to a protective order. (Doc. 10 at 3; Doc. 52 at 93–94, 110–11.) Due to these assurances, the officers, including Turiano, agreed to have their

---

[1] An "image" is a bit-by-bit copy of a cell phone's storage and memory. Imaging allows for any evidence stored on a cell phone to be preserved for forensic analysis.

phones imaged. (Doc. 10 at 3; Doc. 52 at 94.) Shortly thereafter, Turiano's cell phone was imaged by D4 LLC, a third-party, with whom the data remains stored. (Doc. 10 at 3.) The stored data is subject to the terms of a protective order in the Protest Lawsuit. (*Id.*)

In February 2021, a media report was released concerning the existence of a challenge coin that appeared to commemorate the events of August 22, 2017. (Doc. 16 at 3; Doc. 52 at 12.) On one side, the coin depicted a caricature of Cobin being hit in the groin by Turiano's munition, along with the words "Good Night Left Nut." (Doc. 16 at 3.) On the other side, the coin stated the date and location of the protest and the phrase "Make America Great Again One Nut at a Time." (*Id.*) After the media report was released, the City retained law firm Ballard Spahr to conduct an independent investigation into the creation and circulation of the coin. (Doc. 52 at 174–76.) The City also asked Ballard Spahr to investigate any potential connection between the inscription on the challenge coin and the neo-Nazi slogan "Good Night Left Side." (*Id.* at 176.)

In the course of the investigation, Ballard Spahr investigators sought access to the officers' cell phone data that was imaged in connection with the Protest Lawsuit. (Doc. 16-1 at 18–19.) The investigators believed the data provided the best opportunity to locate information regarding the creation and distribution of the challenge coin, since the data was "captured closer in time to the 2017 protest . . . than any information that investigators . . . had access to." (*Id.* at 29.) Accordingly, in March 2021, Ballard Spahr attorneys requested the officers' consent to search the stored data. Each of the officers, including Turiano, declined. (*Id.* at 14.)

Ballard Spahr's investigation was ultimately inconclusive as to the circumstances surrounding the design, creation, and dissemination of the challenge coin. (Doc. 16 at 5; Doc. 16-1 at 33–34.) The firm did conclude, however, that the coin was likely created by someone outside the Department: "While it is likely that someone outside of [the Department] created the coin and its original image and phrasing, investigators were unable to rule out the idea that [Department] employees were involved in the creation." (Doc. 16-1 at 33.) The investigation was likewise inconclusive as to whether there was a connection

between the challenge coin and neo-Nazi ideology. (*Id.* at 20 ("[I]nvestigators encountered no evidence that the people who possessed or distributed the coin made any connection between the phrase 'Good Night Left Nut' and hate speech.").) The final investigative report also indicated that the investigation may have been more fruitful had investigators been able access to the imaged cell phone data: "The officers' refusal to allow access to [their imaged cell phone] data undoubtedly prevented investigators from accessing relevant documents." (*Id.* at 32.) This conclusion appears to have informed the City's subsequent actions.

In July 2021, after the Ballard Spahr investigation concluded, the Department's Professional Standards Bureau ("PSB") proceeded with its own investigation into the challenge coin.[2] (Doc. 52 at 17.) In connection with that investigation, on July 28, 2021, Officer Turiano was interviewed by Lieutenant Ryan Junas. (Doc. 10 at 4.) Lieutenant Lois Weiss, Deputy Human Resources Director Denise Overstreet, and Turiano's union representative, Officer Michael Thomas, were also present. (*Id.*) In the interview, Turiano was asked to consent to a targeted search of his imaged cell phone data. Specifically, PSB asked for his consent to search the imaged data for the following terms: "challenge coin," "one nut at a time," "Cobin," and the word "night" within five words of "left." (Doc. 16 at 5.) Turiano again declined. (Doc. 52 at 135.)

Two weeks later, on August 11, 2021, Turiano was notified by Lieutenant Junas that he was being compelled to consent to a targeted search of his stored cell phone data. Lieutenant Junas informed Turiano that if he did not comply, he would be subject to discipline, "up to and including termination." (Doc. 10 at 4–5.) Turiano was then directed to report to PSB the next day, August 12, 2021. (*Id.* at 5.) He did so, accompanied by Officer Thomas. (Doc. 52 at 35.) On his arrival, Turiano was again informed by Lieutenant Junas that he was being compelled to consent to a search of the imaged data. (*Id.* at 211.) Turiano again refused. Officer Thomas then notified Lieutenant Junas that the Phoenix Law Enforcement Association ("PLEA") believed the Department's actions to be a

---

[2] In fact, PSB's investigation was initiated prior to the inception of the Ballard Spahr investigation but was suspended during the outside investigation's pendency.

violation of Turiano's Fourth Amendment rights. (*Id.* at 35–36, 70.) Lieutenant Junas did not respond to Officer Thomas's statement, and instead served Turiano with a Notice of Investigation ("NOI") that read: "On July 28, 2021, you refused to participate fully in an administrative investigation by failing to provide materials requested by investigators. More specifically, you refused to consent to allow investigators access to data previously obtained by the City from your personal device." (*Id.* at 31, 36–37, 70.)

The City seeks to discipline Officer Turiano on the grounds that he violated Personnel Rules 21b3 and 21b16. Rule 21b3 reads:

> That the employee has violated any lawful or official regulation or order, or failed to obey any lawful and reasonable direction given him by his supervisor, when such violation or failure to obey amounts to insubordination or serious breach of discipline which may reasonably be expected to result in lower morale in the organization, or to result in loss, inconvenience, or injury to the City or the public.

(Doc. 10 at 5.) Rule 21b6 reads: "That the employee has failed to cooperate in an administrative investigation by refusing to attend scheduled meetings, refusing to answer questions to the best of his knowledge, or willful obstruction of the investigation." (*Id.*)

## B.    Procedural Background

Turiano filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on August 18, 2021. (Docs. 1, 2.) The Court held a hearing on the motion the day it was filed. (Docs. 6, 7.) At the hearing, the City agreed to postpone its investigative and disciplinary proceedings pending resolution of Turiano's preliminary injunction motion. (*See* Doc. 7.) Accordingly, the Court denied Turiano's Motion for Temporary Restraining Order as moot, without prejudice to Turiano filing a new motion for preliminary injunction. (*Id.*)

Turiano subsequently filed the instant Motion for Preliminary Injunction. (Doc. 10.) The City responded (Doc. 16), and Turiano filed a reply (Doc. 23). On December 7, 2021, the Court held an evidentiary hearing on the motion. (Docs. 44, 52.) After the hearing, and on the Court's order (*see* Doc. 44), the parties filed closing briefs. (Docs. 53, 54.)

1

## II.    LEGAL STANDARD

2      "A preliminary injunction is an extraordinary remedy never awarded as of right."

3  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a court to issue a

4  preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits,

5  that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

6  balance of equities tips in his favor, and that an injunction is in the public interest." *Am.*

7  *Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting

8  *Winter*, 555 U.S. at 20). In the Ninth Circuit, even "if a plaintiff can only show that there

9  are 'serious questions going to the merits'—a lesser showing than likelihood of success on

10 the merits—then a preliminary injunction may still issue if the 'balance of hardships tips

11 sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell*

12 *Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for*

13 *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)).

14 ## III.   DISCUSSION

15     ### A.    Likelihood of Success on the Merits

16         #### 1.    Governing Law

17     Officer Turiano seeks a preliminary injunction based on a single claim: that the

18 City's proposed search violates his rights under the Fourth Amendment to the Constitution.

19 (*See* Doc. 1 ¶¶ 30–40.) That Amendment provides:

20              The right of the people to be secure in their persons, houses,
                papers, and effects, against unreasonable searches and
21              seizures, shall not be violated, and no Warrants shall issue, but
                upon probable cause, supported by Oath or affirmation, and
22              particularly describing the place to be searched, and the
                persons or things to be seized.
23

24 U.S. Const. Amend. IV. It is well settled that the scope of the Fourth Amendment's

25 guarantee is not limited to the sphere of criminal investigations. *See City of Ontario v.*

26 *Quon*, 560 U.S. 746, 755 (2010). Rather, "'[t]he Amendment guarantees the privacy,

27 dignity, and security of persons against certain arbitrary and invasive acts by officers of

28 the Government,' without regard to whether the government actor is investigating crime or

- 6 -

performing another function." *Id.* at 756 (quoting *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989)); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) ("Because the individual's interest in privacy and personal security 'suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards,' it would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" (quoting *Marshall v. Barlow's Inc.*, 436 U.S. 307, 312–313 (1978))). Consistent with this foundational principle, the Supreme Court has held that the Fourth Amendment applies when the government conducts a search or seizure in its capacity as an employer. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).

The seminal case in this area is *O'Connor v. Ortega*, 480 U.S. 709 (1987). In *O'Connor*, the Supreme Court unanimously agreed that the Fourth Amendment constrains the government when it acts as an employer. *See id.* at 715; *id.* at 731 (Scalia, J., concurring in the judgment); *id.* at 737 (Blackmun, J., dissenting). A majority further agreed that "special needs, beyond the normal need for law enforcement," make the Fourth Amendment's ordinary warrant and probable cause requirements "impracticable" for public employers.[3] *Id.* at 725 (plurality opinion); *id.* at 737 (Blackmun, J., dissenting); *see Quon*, 560 U.S. at 756. The Justices disagreed, however, regarding the proper Fourth Amendment framework applicable in such cases. *Id.* at 756–57.

Justice O'Connor, writing for a four-justice plurality, concluded that the analysis has two steps. *Id.* First, the court must determine, "on a case-by-case basis," whether the employee has a reasonable expectation of privacy, taking into account "[t]he operational realities of the workplace." *O'Connor*, 480 U.S. at 717. Then, where the employee does have a legitimate privacy expectation, the Court must determine whether the employer's search is consistent with "the standard of reasonableness under all the circumstances." *Id.* at 725–26.

---

[3] This exception to the Fourth Amendment's warrant and probable cause requirements is commonly referred to as the "workplace exception."

Justice Scalia, who cast the decisive vote, disagreed. *Quon*, 560 U.S. at 757. In his concurrence, he argued that while searches by public employers are subject to the Fourth Amendment "as a general matter," "government searches to retrieve work-related materials or to investigate violations of workplace rules—searches of the sort that are regarded as reasonable and normal in the private-employer context—do not violate the Fourth Amendment." *O'Connor*, 480 U.S. at 732 (Scalia, J., concurring in the judgment). Thus, on Justice Scalia's view, the preliminary question whether the employee is entitled to Fourth Amendment protection would generally be dispatched with. *Id.* at 729–31. *But cf. id.* at 731 (recognizing that there may be "such unusual situations as that in which the [employee's] office is subject to unrestricted public access, so that it is exposed to the public and therefore not a subject of Fourth Amendment protection." (internal quotation marks omitted)). Instead, the Fourth Amendment inquiry would generally involve only a single question: whether the public employer's intrusion was reasonable. *Id.* at 732.

Since the Supreme Court decided *O'Connor*, "the threshold test for determining the scope of an employee's Fourth Amendment rights has not been clarified further." *Quon*, 560 U.S. at 757. Whether the plurality's or Justice Scalia's approach is controlling has not been established. *See Marks v. United States*, 430 U.S. 188, 194 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal citations and quotation marks omitted)). Because the parties briefed the instant motion on the assumption that the plurality's approach controls (*see, e.g.*, Doc. 10 at 7; Doc. 16 at 6–7), the Court's analysis will likewise track that approach. However, because the Court ultimately holds that Defendant's proposed search is unreasonable under either the plurality's or Justice Scalia's approach, the choice of framework is non-determinative in this case. *Cf. Quon*, 560 U.S. at 757 ("The case can be decided by determining that the search was reasonable even assuming Quon had a reasonable expectation of privacy. The two *O'Connor* approaches . . . therefore lead to the same result here.").

1

**2.      Reasonable Expectation of Privacy**

2      Although the Fourth Amendment constrains the government when it acts in its

3 capacity as an employer, "special needs, beyond the normal need for law enforcement,

4 make the warrant and probable-cause requirement impracticable for legitimate work-

5 related, noninvestigatory intrusions as well as investigations of work-related misconduct."

6 *O'Connor*, 480 U.S. at 725. In lieu of the Fourth Amendment's default warrant and

7 probable cause requirement, then, intrusions by public employers on their employees'

8 constitutionally protected privacy interests are "judged by the standard of reasonableness

9 under all the circumstances." *Id.* at 725–26.

10      Before assessing whether the City's proposed search is reasonable under that

11 standard, however, the Court must determine whether Officer Turiano has a

12 constitutionally cognizable privacy interest in the data imaged from his personal cell phone.

13 If Turiano has no such interest, then his Fourth Amendment rights are not implicated by

14 the City's proposed search and his motion for preliminary injunction must fail. *Id.* at 715

15 ("Our cases establish that . . . Fourth Amendment rights are implicated only if the conduct

16 of the [government] officials at issue . . . infringed 'an expectation of privacy that society

17 is prepared to consider reasonable.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113

18 (1984))). If, on the other hand, Turiano does have a legitimate privacy interest, the Court

19 must determine whether the City's proposed search consists with the protection the Fourth

20 Amendment affords that interest.

21      A reasonable expectation of privacy exists where "a person ha[s] exhibited an

22 actual (subjective) expectation of privacy," and "the expectation [is] one that society is

23 prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967)

24 (Harlan, J., concurring). While "[i]ndividuals do not lose Fourth Amendment rights merely

25 because they work for the government," "operational realities of the workplace . . . may

26 make some employees' expectations of privacy unreasonable when an intrusion is by a

27 supervisor rather than a law enforcement official." *O'Connor*, 480 U.S. at 717. For

28 instance, "employees' expectations of privacy in their offices, desks, and file cabinets, like

1   similar expectations of employees in the private sector, may be reduced by virtue of actual

2   office practices and procedures, or by legitimate regulation." *Id.* For this reason, "the

3   question whether an employee has a reasonable expectation of privacy must be addressed

4   on a case-by-case basis." *Id.* at 718.

5          In making this case-by-case determination, courts have considered such factors as

6   whether the work area in question was used exclusively by the employee, the extent to

7   which others had access to the workspace, the nature of the employment, and whether

8   office policies or regulations placed the employee on notice that the work area was

9   subject to employer intrusions. *See Vega-Rodriguez v. P.R. Tel. Co.*, 110 F.3d 174, 179

10  (1st Cir. 1997). In *O'Connor*, for instance, the Supreme Court determined that the

11  plaintiff—a physician at a public hospital—had a reasonable expectation of privacy in his

12  desk and file cabinets because (1) he did not share them with other employees; (2) he

13  occupied the office for a long period of time and kept certain items in the office that were

14  unconnected to his employment, including personal correspondence and financial records;

15  and (3) the hospital had no established regulation or policy discouraging employees from

16  storing personal items in their desks or file cabinets. *See O'Connor*, 480 U.S. at 718–19.

17         Applying those factors in the instant case, the Court easily concludes that Turiano

18  has a reasonable expectation of privacy in the imaged data the City seeks to search. The

19  data was imaged from Turiano's personal cell phone, the City did not purchase the phone

20  and does not pay for the data plan, Turiano generally does not use the phone for work

21  purposes,[4] and no other City employees have access to the phone or its data. And the

22  imaged data contains an enormous amount of deeply personal information that is entirely

23  unconnected with Turiano's employment, including his personal correspondence and

24  financial information. *See Riley v. California*, 573 U.S. 373, 396–97 (2014). While an

25  employee's expectation of privacy in the workplace may be reduced by prior notice to the

26  ─────────────
27  [4] Because Turiano has no Department-issued phone, he occasionally uses his personal phone for limited work-related purposes, in accordance with Department policy. (Doc. 52 at 109.) But such use is insufficient to negate his reasonable expectation of privacy. Indeed, it would be perverse to permit the Department to require its officers to use their personal devices for work-related purposes and then hold that by doing so, they forfeit their constitutional rights. The Constitution's guarantees are not so easily cast aside.

28

employee—e.g., through a policy or regulation established by the employer—that the workspace is subject to search, *see, e.g.*, *Quon*, 560 U.S. at 762; *United States v. Gonzalez*, 300 F.3d 1048, 1050 (9th Cir. 2002); *United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993); *Am. Postal Workers Union v. USPS*, 871 F.2d 556, 560 (6th Cir. 1989), the Department had no such policy in place here.

Despite the City's assertions to the contrary, the Department's Operations Order 3.27 does not provide such notice. The Operations Order, entitled "Social Media Use Policy," does not address the Department's authority to search employees' personal devices to investigate potential work-related misconduct. It is instead intended to "establish[] the Department's position on the utility and management of social media." (Doc. 16-1 at 48.) While the Operations Order's "Scope" section does discuss the Department's right to access employees' private devices, it states only that "[t]he Department also reserves the right to inspect any personally owned devices *used to conduct City business*." (*Id.* (emphasis added).) But Turiano's personal cell phone was not used in that manner.

Another portion of the Operations Order, quoted by Defendant (*see* Doc. 16 at 10), is found in a section entitled "Investigative Use." (Doc. 16-1 at 52.) The section begins by stating that "[s]ocial media is a valuable investigative tool when seeking evidence or information," and then details procedures to be followed by officers when using social media in that manner. (*Id.*) It states, for example, that "[e]mployees are prohibited from using personal cell phones or any personally owned recording device of any type . . . to record, upload, transfer, or share . . . items of evidence obtained in the course of their duties, except in furtherance of an authorized . . . investigation." (*Id.*) It is in this context— indeed, in the very next paragraph—that the Operations Order states: "Employees are reminded any personal electronic devices used on duty and/or in an official capacity may be subject to review, subpoena, discovery, public records requests, and/or impound for possible evidentiary value." (*Id.*) The cited provision is therefore intended to encourage employees to exercise discretion in using social media as an investigative tool; it is not

intended to put employees on notice that the Department can search their private devices in investigating potential workplace misconduct. And, again, the provision applies only to devices "used on duty and/or in an official capacity."[5] (*Id.*)

In the absence of such a policy, Turiano has a reasonable expectation of privacy in the data imaged from his personal cell phone. *Cf. O'Connor*, 480 U.S. at 718; *United States v. Slanina*, 283 F.3d 670, 677 (5th Cir. 2002); *Leventhal v. Knapek*, 266 F.3d 64, 73–74 (2d Cir. 2001); *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991); *Port Auth. Police Benevolent Ass'n v. Port Auth. of New York & New Jersey*, 2017 WL 4403310, at *5 (S.D.N.Y. Sept. 29, 2017).

### 3.    Applicability of the Workplace Exception

Before the Court can address whether the City's proposed search consists with the "standard of reasonableness" articulated in *O'Connor*, the Court must first determine whether the workplace exception is at all applicable in this case. If not, the Fourth Amendment's ordinary warrant and probable cause requirement applies and no further analysis of the merits is needed, because the City neither has a warrant to search the imaged data nor argues that a warrantless search is permissible under another exception.

The question whether the *O'Connor* framework applies to a public employer's search of an employee's personal cell phone is an issue of first impression in the Ninth Circuit.[6] In fact, the parties have not cited, and the Court's own research has not uncovered, any prior federal appellate court decision that squarely addresses the issue.

---

[5] Even if the Operations Order means what the City claims it does, the Court seriously doubts whether the Department can constitutionally abrogate an employee's privacy expectation in the contents of his personal cell phone merely by enacting such a policy, particularly in light of the Supreme Court's recent Fourth Amendment decisions in cases involving cell phones. *See, e.g.*, *Riley*, 573 U.S. 373; *Carpenter v. United States*, 585 U.S. ---, 138 S. Ct. 2206 (2018).

[6] While the Supreme Court has held that the workplace exception applies to the search of a public employee's *government-issued* pager, *see Quon*, 560 U.S. at 759–60, neither the Supreme Court nor the Ninth Circuit has addressed whether the exception applies to the search of an employee's *personal* cell phone. *But cf. Larios v. Lunardi,* 856 F. App'x 704, 706 (9th Cir. 2021) (Hunsaker, J., concurring) ("I question whether the workplace exception to the Fourth Amendment's warrant requirement applies to the search of an employee's personal cellphone where the employee has not relinquished his privacy interests in the cellphone by agreeing to give the employer access or by some other means."); *Larios v. Lunardi*, 445 F. Supp. 3d 778, 783 (E.D. Cal. 2020) (assuming, without discussing, that the *O'Connor* framework applies in a similar context).

The workplace exception recognized in *O'Connor* permits public employers to conduct warrantless searches for non-investigatory work-related purposes or to investigate workplace misconduct. *O'Connor*, 480 U.S. at 725. But not all searches conducted for such purposes come within the scope of the exception. An employer's warrantless search of an employee's home, for instance, generally does not come within the exception even when the search is conducted to investigate workplace misconduct. *See, e.g.*, *Sabin v. Miller*, 423 F. Supp. 2d 943, 950 (S.D. Iowa 2006). Rather, such a search requires probable cause and a warrant, or another applicable exception to the warrant requirement, to pass constitutional muster. To hold otherwise, and permit the workplace exception to justify warrantless government intrusion even into those areas, such as the home, that "deserve the most scrupulous protection from government invasion," *O'Connor*, 480 U.S. at 715, would eviscerate the Fourth Amendment's efficacy for government employees.

Properly understood, the workplace exception is limited to those searches that are conducted in the "workplace context." *Id.* at 715–16. This "includes those areas and items that are related to work and are generally within the employer's control." *Id.* at 715. But it does not include those areas and items that are not related to the employee's work and are not generally within the employer's control. As the Supreme Court explained in *O'Connor*:

> Not everything that passes through the confines of the business address can be considered part of the workplace context . . . . An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the contents of the luggage is not affected in the same way. The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address.

*Id.* at 716. Applying this logic, courts have held that searches of employees' locked personal safes, medical records, and homes are outside the scope of the workplace exception. *See James v. Hampton*, 592 F. App'x 449, 457 (6th Cir. 2015) (declining to apply *O'Connor* to the search of a personal safe, kept in the employee's office, where the employee "purchased the safe herself, kept it locked, and used it to store personal items");

*Nat'l Ass'n of Letter Carriers v. USPS*, 604 F. Supp. 2d 665, 675–76 (S.D.N.Y. 2009) (holding that the search of employee's medical records in the possession of the employee's healthcare provider, without the employee's knowledge or consent, did not come within the workplace exception); *Sabin*, 423 F. Supp. 2d at 950–51 (finding that the workplace exception did not apply to an employer's search of an employee's home).

At least two courts employing the same reasoning have held that a public employer's search of an employee's personal cell phone to obtain information concerning work-related misconduct was outside the scope of the workplace exception. *See Port Auth. Police Benevolent Ass'n*, 2017 WL 4403310, at *4 ("searches of a personal cell phone" do not come within the "workplace context"); *Zimmerman v. Knight*, 421 F. Supp. 3d 514, 520–21 (S.D. Ohio 2019), *aff'd sub nom. Lazar v. Knight*, No. 19-4239, 2020 WL 7396255 (6th Cir. Oct. 7, 2020) ("In the Sixth Circuit, a government search of [an employee's] personal cellphone . . . would not typically be a search within the workplace context, and the standard established in *O'Connor* would not apply to such a search."). The Court agrees, for three reasons.

First, a personal cell phone is just that—personal. As such, it is not "generally within the employer's control." *O'Connor*, 480 U.S. at 715. In that sense, a cell phone is more closely analogous to "a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address" than it is to an "office[], desk[], [or] file cabinet[]" that is "part of the workplace." *Id.* at 716.

Second, a personal cell phone, far more than even a closed briefcase or locked safe, contains sensitive personal information that is entirely unrelated to an individual's employment. As the Supreme Court recently opined:

> [A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

*Riley*, 573 U.S. at 396–97. Just as a public employer lacks authority to rummage through

an employee's home for evidence of workplace misconduct without a warrant, so too an employer lacks authority to conduct a warrantless search of an employee's personal cell phone.

Third, cell phones are so pervasive an aspect of modern life that virtually any public employee will have, and occasionally use, a personal cell phone during business hours. *See Carpenter*, 138 S. Ct. at 2220 ("[C]ell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." (quoting *Riley*, 573 U.S. at 385)); *see also Riley*, 573 U.S. at 395 ("Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception."). That an employee's personal cell phone "happens to be within the employer's business address," or happens to be used to send the occasional work-related message, is therefore insufficient to render the cell phone part of the "workplace context." *O'Connor*, 480 U.S. at 715–16.

For these reasons, the Court concludes that the workplace exception is inapplicable in this case, where the Department, a public employer, seeks to search its employee's purely personal cell phone for evidence of work-related misconduct. Since the Department neither has a warrant to search the imaged data, nor claims that another exception to the warrant requirement applies, Turiano is likely to prevail on the merits of his Fourth Amendment claim.

### 4.    Standard of Reasonableness

Even under the workplace exception set forth in *O'Connor*, the City's proposed search is unconstitutional. For a public employer's search to be permissible under the workplace exception, the search must be consistent with "the standard of reasonableness under all the circumstances." *Id.* at 725–26. This "standard of reasonableness" has two components. First, the search must be "justified at its inception." *Id.* at 726 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Second, the search must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *T.L.O.*,

469 U.S. at 341). In this case, the Court need not address the scope of the City's proposed search, because the search is not "justified at its inception."

In the public employment context, a search is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *Id.* Reasonable suspicion is a less demanding standard than probable cause, but requires "more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). The standard "is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Instead, the Court must "consider 'the totality of the circumstances—the whole picture'" in assessing whether reasonable suspicion exists. *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The City contends that it has reasonable suspicion that the proposed search will uncover evidence that Turiano engaged in work-related misconduct. Indeed, in its view, "numerous factors support a reasonable, common-sense conclusion that the data from Turiano's phone is likely to include evidence relating to the creation and/or dissemination of the Challenge Coin." (Doc. 54 at 10.) But the Court is not persuaded.

As one factor supporting reasonable suspicion, the City cites Ballard Spahr's investigative report. The report states, in pertinent part:

> As discussed earlier in this report, investigators believe the best potential source of documentary evidence is the data that was imaged from officers' phones in the [Protest Lawsuit]. That data was captured closer in time to the 2017 protest and ensuing distribution of the coin than any information that investigators have had access to, and thus would have provided a more fulsome accounting of the events that were investigated. The officers' refusal to allow access to this data undoubtedly prevented investigators from accessing relevant documents.

(Doc. 16-1 at 32.) The City's reliance on Ballard Spahr's conclusion is misplaced. Despite its unreserved confidence, the Ballard Spahr report offered no evidentiary support for the conclusion that relevant documents would "undoubtedly" be found on the officers' imaged

phones. Instead, as support for its conclusion, the firm stated only that the "data was captured closer in time to the 2017 protest" than any other evidence the firm had obtained during its investigation. (*Id.* at 32.) But the mere fact that the data was captured closer in time to the 2017 protest hardly indicates it is likely to contain evidence of officer misconduct. Indeed, while the images were captured closer in time to the protest than the investigators' other evidence, the imaging still did not occur until sometime in late 2018—more than a year after the protest took place. Thus, while temporal proximity can be a relevant factor in forming reasonable suspicion, *see, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), the tenuous connection cited here does little to advance Defendant's cause. And even if the Ballard Spahr report is correct as a general matter that the officers' imaged cell phones are likely to contain documents related to the challenge coin, the City has offered no evidence suggesting that Officer Turiano's phone, in particular, is likely to contain such evidence.

Instead, the City points only to the fact that "Turiano was at the center of the incident, as the officer who fired the munitions shot that is being commemorated." (Doc. 54 at 10.) Again, the City relies too heavily on this fact. Although Ed Zuercher, who served as City Manager for Phoenix from October 2013 until October 2021, testified that "[Turiano's phone] could logically and realistically be a place where people would be sending messages of what's happening or what they are thinking or what they have done as sort of, you know, maybe he's the pass-through of that because he was the focal point" (Doc. 52 at 194), such a theory is based on assumptions requiring nonobvious leaps in logic. That Turiano carried out his duties as a grenadier during the 2017 protest, in accordance with Department policy (as the City concedes), is hardly reasonable grounds for suspecting that he created or distributed the challenge coin depicting his actions. In fact, Lieutenant Junas testified that the City had identified the individuals responsible for distributing the coins to City employees, and that Turiano was not one of them. (*Id.* at 29.) Turiano did receive two challenge coins and two patches unsolicited through inter-departmental mail, but there is no evidence that anyone reached out to Turiano on his

personal cell phone about such memorabilia. And, as the City concedes, merely possessing the coin or related memorabilia does not constitute misconduct. (*Id.* at 29, 214–15.)

The City also argues its suspicion is supported by the fact that "Turiano testified under oath in the Protest Lawsuit that he sent multiple texts about the August 22, 2017 munitions shot using his personal phone." (Doc. 54 at 11.) But this argument, too, is unavailing. As mentioned above, for the City's proposed search to be justified at its inception, the City must have reasonable suspicion that the search will uncover "evidence that [Turiano] is guilty of work-related misconduct." *O'Connor*, 480 U.S. at 726. That is, it must reasonably believe that Turiano engaged in misconduct and that his imaged data contains evidence of such misconduct. Because discussing the 2017 protest (including the munitions shot) does not constitute misconduct, suspicion that the search will uncover evidence that Turiano sent and received messages about the protest will not do.

Despite the City's arguments to the contrary, the mere fact that Turiano corresponded with his friends and family about the munitions shot does not indicate that his phone is likely to contain evidence about the creation or meaning of the challenge coin. Turiano could easily have discussed his role in the protest with family and friends and yet had nothing whatsoever to do with the coin. The coin, for instance, may well have been created by a member of the public or by another officer without Turiano's knowledge. In fact, the Ballard Spahr report concluded that was most likely the case. (Doc. 16-1 at 33 ("[I]t is likely that someone outside [the Department] created the coin and its original image and phrasing).) While acts that are "readily susceptible to an innocent explanation" can, in some instances, form the basis of reasonable suspicion, *see Sokolow*, 490 U.S. at 9–10; *Terry*, 392 U.S. at 22–23, Turiano's acts are insufficient to do so in this case.

Considering all of the factors cited by the City in conjunction, as the Court must, *see Sokolow*, 490 U.S. at 7–8, the City's suspicion is unreasonable. While "rational inferences" drawn from "specific and articulable facts" can form the basis of reasonable suspicion, *see Terry*, 392 U.S. at 21, the City bases its suspicion here far too heavily on inferences and far too little on facts. Indeed, virtually the entire basis for the City's

suspicion derives from a single fact: that Turiano fired the munitions shot at the August 2017 protest. Absent additional facts, including facts suggesting that Turiano engaged in misconduct in connection with the challenge coin (i.e., by designing, creating, or distributing the coin), the City's suspicion amounts to little more than an inarticulate guess—a hunch. Reasonable suspicion, though not an exacting standard, requires more. *Sokolow*, 490 U.S. at 7.

Even if the City did have reasonable suspicion that Turiano's imaged phone data contains some evidence of employee misconduct, it concedes that it does not suspect the data contains evidence of Turiano's own misconduct. Former Phoenix City Manager Zuercher, whose decision it was to compel Turiano to submit to the search, admitted as much during his testimony:

> Q. Is the purpose of looking at Officer Turiano's phone data solely to determine if he personally committed policy violations?
>
> A. No. I don't actually have any expectation that he would have. I think what made sense was as the focal point, because he fired the shot and he was doing his job, that it would be logical that if anybody was going report in that they were doing something or excited about doing something, that it could pass through him. And so it seems likely more than others that that phone would be a place where texts would be coming in saying what people were doing, thinking, distributing, whatever it would be.

(Doc. 52 at 195.) Zuercher also testified that the City lacked reasonable suspicion that Turiano participated in the creation of the challenge coin when it initially sought to compel him to submit to its proposed search:

> Q. Did the City of Phoenix have any suspicion whatsoever that Officer Turiano created the Challenge Coin?
>
> A. I don't know that specifically. I mean, it was part of this report where we were trying to get to information that wasn't available to us as a result of this report.
>
> Q. Yeah. I'm asking whether there was any evidence that he actually created it at that point, on August 12, 2021?
>
> A. No. We didn't know that because we weren't able to access information that would tell us whether there was evidence or not.

(*Id.* at 213.) Defendant contends that these admissions are inconsequential, because "the City is permitted to search [Turiano's] phone for evidence of policy violations by other officers." (Doc. 54 at 12–13.) Plaintiff, on the other hand, argues that "[n]o court has extended the workplace exception to permit the warrantless search of an employee's personal cell phone for evidence of possible misconduct by another employee," and that this Court should decline to do so. (Doc. 53 at 12–13.)

The Supreme Court has not yet decided "whether individualized suspicion is an essential element of the standard of reasonableness" set forth in *O'Connor*. *See O'Connor*, 480 U.S. at 726 (citing *T.L.O.*, 469 U.S. at 342 n.8). However, "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." *T.L.O.*, 469 U.S. at 342 n.8 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61 (1986)). Exceptions to this prerequisite "are generally appropriate only where the privacy interests implicated by a search are minimal." *Id.* This is not such a case. The proposed search at issue here implicates Turiano's substantial privacy interest in the contents of his personal cell phone—an interest afforded the most stringent Fourth Amendment protection. *See Riley*, 573 U.S. at 393 ("Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by a [traditional search]."). This interest overcomes the City's competing, but also significant, interest in avoiding employee inefficiency, incompetence, and misconduct. *See O'Connor*, 480 U.S. at 723–24. Thus, individualized suspicion is required in this case. Because the City concedes that its proposed search is not based on such suspicion, the search is unreasonable.

For all these reasons, Turiano has demonstrated a likelihood of success on the merits of his Fourth Amendment claim.

## B.     Irreparable Harm

To obtain preliminary relief, Turiano must also show that he is likely to suffer irreparable harm in the absence of an injunction. *Winter*, 555 U.S. at 22. Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). As the City notes,

wrongful employment discipline, including discharge, generally does not qualify as such harm, because employees can be retroactively compensated through money damages. *See Sampson v. Murray*, 415 U.S. 61, 89–90 (1974). But where, as here, an employee seeks to enjoin his employer from imposing discipline in response to the exercise of his constitutional rights, a different conclusion obtains. In such a case, the irreparable harm is not the discipline imposed, but rather the deprivation of the employee's constitutional rights. *See Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right." (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968))).

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Collins v. Brewer*, 727 F. Supp. 2d 797, 812 (D. Ariz. 2010) (constitutional violations "cannot be adequately remedied through damages and therefore generally constitute irreparable harm"); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). Thus, while employment discipline is generally compensable through damages, the City's invasion of Turiano's constitutionally protected privacy interests by means of an unlawful search is not. *Cf. Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009); *Nelson*, 530 F.3d at 882. Once the City conducts the search, the constitutional harm will have occurred, and Turiano will have no recourse at law. The irreparable harm factor therefore weighs heavily in favor of granting an injunction.

### C.    Balance of Hardships and Public Interest

Turiano must also demonstrate that the balance of hardships tips in his favor and that an injunction is in the public interest. *Winter*, 555 U.S. at 24. "[D]istrict courts must give serious consideration to the balance of equities." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted). In so doing, "courts 'must balance the

competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). In this case, the balance tilts sharply toward Turiano, who is likely to suffer the significant and irreparable deprivation of his Fourth Amendment rights in the absence of an injunction. *See Nelson*, 530 F.3d at 881 ("The balance of hardships tips sharply toward Appellants, who face a stark choice—either violation of their constitutional rights or loss of their jobs."). Turiano may also be subject to drastic and adverse employment consequences, including termination, that carry with them substantial economic and emotional hardship. *Id.* at 882 ("[T]he loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages.").

If preliminary relief is granted, on the other hand, the City will face no significant harm. Defendant argues that "the harm caused to an employer—especially a municipal police department charged with protecting the citizens of the community—if it cannot appropriately investigate misconduct that impairs order and causes distrust in the community is extensive and highly consequential." (Doc. 16 at 18.) But granting the requested injunction in this case will not bar the Department from investigating its employees' potential misconduct. Rather, it will prevent the Department only from searching Officer Turiano's cell phone data, and will do so only pending the final adjudication of this action. Indeed, should it ultimately be determined, at the conclusion of this action, that the search is permissible under the Fourth Amendment, the City can proceed as planned, search the imaged data, and uncover any evidence the imaged data may contain relevant to the challenge coin. The only harm the City will suffer is a delay in conducting the proposed search, which pales in comparison to the harm Turiano will face if the Court declines to issue the injunction.

The public interest factor, unlike the balance of hardships, "primarily addresses [the injunction's] impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002). The Court recognizes the legitimate and significant

public interest in maintaining the public's trust and confidence in the Department. But that interest is overcome by the public's overwhelming and compelling interest in enforcing the rights guaranteed by the Constitution. Indeed, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (emphasis added); *see also Ariz. Dream Act Coal.*, 757 F.3d at 1069 ("[T]he public interest and the balance of the equities favor preventing the violation of a party's constitutional rights." (citation and internal quotation marks omitted)). That is especially true in this case, given the Department's central and unique role in upholding and enforcing the law. The public has a particular interest in the Department being held to abide by the strictures of the Constitution, both in dealing with the public and with its own employees.

On the flip side, the extent to which the particular injunction sought by Turiano would burden the Department's interest in maintaining the public trust is unclear. As mentioned above, even if the injunction is granted, the Department is free to continue investigating the circumstances surrounding the challenge coin through other, lawful means. The harm such an injunction will inflict upon the public's interest in uncovering the parties responsible for creating and distributing the challenge coin is therefore minimal.

Thus, the balance of the equities and public interest both weigh decisively in favor of issuing an injunction.

### D.    Bond

Under Federal Rule of Civil Procedure 65(c), a court may grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although this language appears to be mandatory, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). Consistent with that discretion, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* Thus, because there is no

evidence that the City will incur monetary injury if a preliminary injunction is issued in this case, the Court will exercise its discretion to waive the security requirement.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED granting** Plaintiff's Motion for Preliminary Injunction (Doc. 10).

**IT IS FURTHER ORDERED enjoining** Defendant the City of Phoenix and its officers, agents, employees, attorneys, and all other persons or entities in active concert or participation with them, for the duration of this action, from pursuing administrative, investigative, or disciplinary proceedings against Plaintiff Christopher Turiano based on his refusal to consent to a search of his personal cell phone data that was imaged in 2018 and is being held by third-party vendor D4 LLC.

Dated this 4th day of February, 2022.

_Michael T. Liburdi_

Michael T. Liburdi
United States District Judge